# IN THE SUPREME COURT OF IOWA

No. 21–0148

Submitted April 15, 2021—Filed May 28, 2021

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**HAROLD K. WIDDISON,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

Iowa Supreme Court Grievance Commission determined that an attorney violated multiple rules of professional conduct and recommended the attorney's license be suspended. **LICENSE SUSPENDED.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Tara van Brederode and Crystal Rink, Des Moines, for complainant.

John C. Gray, Sioux City, for respondent.

**APPEL, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board charged Iowa attorney Harold K. Widdison with a series of ethical violations related to his conduct during his postdivorce litigation and trust account management. After a hearing, the Iowa Supreme Court Grievance Commission determined that Widdison violated Iowa Rules of Professional Conduct 32:3.1 (frivolous defenses or proceedings), 32:3.3(a)(1) (false statements of law or fact before a tribunal), 32:8.2(a) (false statement regarding the integrity of a judge), and 32:8.4(c) (dishonesty, fraud, deceit, or misrepresentation). The commission recommended Widdison's license be suspended for one hundred twenty days. Upon our de novo review, we find that Widdison violated multiple disciplinary rules and impose a ninety-day suspension of Widdison's license to practice law.

## I. Background Facts and Procedural History.

**A. Overview.** Harold Widdison has been an Iowa attorney since June 16, 1995. Widdison maintains a solo private practice law firm in Sioux City. He is an experienced and respected attorney. Widdison has not had a prior disciplinary history.

Widdison and his former spouse, Amy Dendy, were divorced in 2015. In the divorce proceedings, the parties entered into a settlement agreement filed on January 20, 2015. The district court entered a divorce decree that same day. As part of the settlement agreement, Dendy became the sole owner of a 50% interest in an apartment complex that had previously been owned jointly by Widdison and Dendy. Widdison and Dendy entered into a settlement agreement which mutually released all claims they might have against each other. Joint child custody was awarded.

**B. Allegations of Disciplinary Board.**

1. *Introduction.* On April 21, 2020, the Iowa Supreme Court Attorney Disciplinary Board filed a two-count complaint against Widdison. In count I, the Board alleged a series of ethics violations in connection with his conduct during postdivorce litigation. In count II, the Board alleged Widdison engaged in various trust account violations.

2. *Ethical violations related to postdivorce litigation.* In count I, the Board alleged ethical violations arising from four separate events. First, according to the Board, Widdison prosecuted a frivolous claim for past attorney fees against his former spouse and Northpark, a limited liability company wholly owned by his former spouse. Second, the Board asserted that Widdison sought to recuse the magistrate hearing his attorney fees claim by making a false allegation that she had a conflict of interest which disqualified her from hearing the case. Third, the Board claimed that in a modification proceeding, Widdison threatened potential witnesses by sending a letter to several witnesses, purportedly addressed to the judge in the case that claimed negative information would be revealed against the witnesses if they were subject to cross-examination. Fourth, the Board alleged that in the modification proceeding, Widdison falsely claimed that the judge handling the matter told the parties that "she was suffering some form of brain cancer and that the Court's decision will take a long time to issue." When the court characterized Widdison's statement as "false" or "not truthful," the Board stated that Widdison sought to strike the court's references. The Board claimed that Widdison repeated his false claims in several other documents filed with the court.

Based on the above conduct, the Board alleged that Widdison violated Iowa Rules of Professional Conduct 32:3.1 (frivolous defenses or proceedings), 32:3.3(a)(1) (false statement of fact or law to a tribunal),

32:8.2(a) (false or reckless statements concerning a judge), and 32:8.4(c) (dishonesty, fraud, deceit, or misrepresentation).

3. *Ethical violations related to trust accounts.* In count II of the complaint, the Board alleged that on December 18, 2018, an auditor for the Iowa Supreme Court Client Security Commission (Client Security Commission) began an audit of Widdison's client trust account. According to the Board, auditor Tony A. Bennett found six negative client account balances, one due to a timing issue regarding receipt of funds, with the remaining five accounts showing a negative balance of $293.61. The Board further asserted that it found seven stale client accounts without activity in over a year with a combined balance of $2605.94. The Board asserted that Widdison either withdrew the funds to pay outstanding balances or refunded the amounts to the clients.

On December 13, 2019, the Board stated it received information about Widdison's accounts from the Client Security Commission. The Board asserted it provided Widdison with notice of the complaint on December 17. According to the Board, Widdison denied that he was out of compliance with any trust account rules and denied the summary of the audit results prepared by the Client Security Commission.

Based on the above allegations, the Board charged Widdison with violation of Iowa Rules of Professional Conduct 32:1.15(a) (separate funds for client property), 32:1.15(d) (prompt delivery of client funds), 32:1.15(f) (trust accounts governed by chapter 45 of the Iowa Court Rules), and 32:8.1(a) (lawyer in connection with disciplinary proceeding shall not knowingly make a false statement of material fact), and Iowa Court Rule 45.2(2) (prompt delivery of funds client is entitled to receive and provide a full accounting).

**C. Hearing Before the Grievance Commission.** The Iowa Supreme Court Grievance Commission held a hearing on the Board's complaint on September 14 and 15, 2020. The commission heard testimony from twelve witnesses, including Chief Judge Duane Hoffmeyer, Judge Nancy Whittenburg, and Magistrate Jenny Winterfeld. Both sides introduced exhibits.

**D. Findings of Fact, Conclusions of Law, and Recommended Sanctions.**

1. *Overview.* The commission filed its findings of fact, conclusions of law, and recommended sanctions in a thorough and detailed forty-five-page document. The commission found multiple violations of our ethical rules related to Widdison's postdivorce litigation activity.

2. *Postdivorce litigation activity.* On the Board's allegations related to Widdison's conduct during his postdivorce litigation, the commission found that Widdison knew that the facts and law precluded him from making the claim for attorney fees against Dendy and Northpark, that he had no basis in law or fact to bring the action, and that he had an ulterior motive to harm Dendy. The commission concluded that the Board had proved by a convincing preponderance of the evidence that the conduct of Widdison in prosecuting the attorney fees action violated Iowa Rule of Professional Conduct 32:3.1.

The commission also made adverse findings and conclusions in connection with Widdison's effort to disqualify Magistrate Winterfeld in the small claims action. The commission found that Widdison's claim that Northpark "is a client of the Klay Law Firm" was without any factual basis. The commission found that the source of Widdison's information was unknown, and that in any event he did nothing to ascertain the facts supporting the allegations. While Widdison testified that he had a

conversation with Klay Law Firm attorney Brad De Jong about the alleged conflict, the commission found the testimony so vague and unsubstantiated that it concluded the conversation never took place. The commission concluded that in Widdison's baseless charge of a conflict, the Board proved by a convincing preponderance of the evidence that Widdison violated rule 32:3.1.

Additionally, the commission made adverse findings and conclusions against Widdison in connection with his repeated claim that Judge Whittenburg had stated that it would take her some time to get out a ruling in the modification action because she had been suffering from brain cancer. At the hearing, the commission found that Judge Whittenburg testified convincingly that she did not make the statement and that her cancer was resolved years before the time Widdison claims she made the statement. While Widdison's wife corroborated Widdison's testimony, the commission found her testimony not believable and rehearsed. Even after being presented with the truth, Widdison repeated his claim in multiple court filings. As to the later statements, the commission had no doubt that the statements were false. As a result, the commission determined that the Board proved by a convincing preponderance of the evidence that Widdison's conduct violated rule 32:3.3(a)(1). The commission also found a violation of rule 32:3.3(a)(1) based on Widdison's assertion that Chief Judge Hoffmeyer misspoke when he stated that Judge Whittenburg returned to the bench in late 2013.

Finally, the commission made adverse findings and conclusions against Widdison in connection with his sending potential witnesses Ploeger and Lammers a letter purportedly addressed to Judge Whittenburg suggesting that if witnesses appeared at the hearing, negative information would come out on cross-examination. The commission found that the

letter was never sent to Judge Whittenburg and that Widdison had no explanation for it. According to the commission, Widdison was clearly trying to mislead and intimidate witnesses for the opposing party the week before trial. As a result, the commission found that the Board proved by a convincing preponderance of the evidence that Widdison violated rule 32:8.4(c).

3. *Trust fund violations.* The commission was not impressed with the Board's evidence regarding the trust fund rule violations. The commission found that Widdison had been sloppy in his accounting practices but there was no conversion of client property and Widdison had no intent to enrich himself at his clients' expense. The commission noted that the Board's auditor indicated that the errors were minor mathematical errors common to sole practitioners around the state. The commission concluded that with respect to alleged trust fund violations, the Board failed to show by a convincing preponderance of the evidence any violation of our disciplinary rules related to management of trust funds.

4. *Sanctions.* As required by our precedents, the commission considered aggravating and mitigating factors and our caselaw in determining the level of recommended sanction. As aggravating factors, the commission noted that there were multiple rule violations and that there was harm to Dendy and to the judicial system through the pursuit of meritless claims. The commission further noted that Widdison persistently repeated falsehoods. The commission also cited his failure to learn from prior audits of his trust accounts. The most egregious aggravating factor, according to the commission, was his untruthful and evasive testimony at the commission hearing.

As mitigating factors, the commission noted that Widdison had no prior discipline. The commission further found that Widdison exhibited remorse. The commission also found that Widdison is an experienced attorney working in northwest Iowa, an underserved area of the state.

The commission engaged in a review of our disciplinary cases related to sanctions. Among other cases, the commission cited *Iowa Supreme Court Attorney Disciplinary Board v. Sporer,* 897 N.W.2d 69, 85–87 (Iowa 2017) (imposing six-month suspension for violation of disciplinary rules for misconduct involving a frivolous claim and false statements); *Iowa Supreme Court Attorney Disciplinary Board v. Rhinehart,* 827 N.W.2d 169, 180–82 (Iowa 2013) (imposing a sixty-day suspension for violation of disciplinary rules arising from misconduct including fraud and inexcusable delay in returning client funds); *Iowa Supreme Court Attorney Disciplinary Board v. Weaver,* 750 N.W.2d 71, 77–78 (Iowa 2008) (imposing a three-month suspension where attorney made false statement to newspaper regarding a judge); *Iowa Supreme Court Board of Professional Ethics & Conduct v. Ronwin,* 557 N.W.2d 515, 521–22 (Iowa 1996) (per curiam) (revoking an attorney's license for falsely accusing judges of "deliberately lying" and conduct that amounted to obstruction of justice).

Based on the aggravating and mitigating factors, and a review of our caselaw, the commission concluded that Widdison's license to practice law should be suspended for one hundred twenty days.

**E. Issues on Appeal.** Neither party filed an appeal in this matter, but both parties filed statements regarding the appropriate sanction. The Board urges us to impose the one hundred twenty-day suspension recommended by the commission. Widdison urges us to reduce the sanction to a private admonition.

## II. Standard of Review.

We review factual findings of the commission de novo. Iowa Ct. R. 36.21(1); *Comm. on Pro. Ethics & Conduct v. Baker*, 492 N.W.2d 695, 700–01 (Iowa 1992) ("Although Baker did not appeal, we still review de novo the record made before the commission. We independently decide the matter and take appropriate action on it." (citation omitted)). "We give respectful consideration to commission findings, especially when considering credibility of witnesses, but are not bound by them." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Said*, 953 N.W.2d 126, 142 (Iowa 2021). The Board must prove attorney misconduct charges by a convincing preponderance of the evidence which is a burden higher than the traditional preponderance of the evidence of most civil cases but lower than the beyond the reasonable doubt standard of a criminal prosecution. *Id.*; *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 603 (Iowa 2015). The burden is less stringent than a clear and convincing evidence standard. *Said*, 953 N.W.2d at 142; *Moothart*, 860 N.W.2d at 603. We "may impose a lesser or greater sanction than the discipline the grievance commission recommends." Iowa Ct. R. 36.21(1); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 953 N.W.2d 156, 160 (Iowa 2021).

## III. Discussion.

**A. Introduction.** In engaging in our de novo review, we note that the commission in this case has made specific credibility findings with respect to witnesses that appeared before it. The commission found that the testimony of Widdison and his spouse were not credible. Conversely, the commission found the Board's witnesses to be credible. Such findings, of course, are not determinative, but are entitled to respectful consideration by the court. *Iowa Sup. Ct. Att'y Disciplinary Bd. v.*

*Arzberger*, 887 N.W.2d 353, 367 (Iowa 2016); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 659 (Iowa 2013).

We begin our discussion on the merits by providing the legal framework for the alleged violations of our disciplinary rules. We then apply the facts of the case to the legal framework to determine whether the Board proved by a convincing preponderance of the evidence that Widdison violated the ethical rules.

**B. Legal Framework.**

1. *Iowa Rule of Professional Conduct 32:3.1 (frivolous proceedings).* This rule relates to meritorious claims and contentions, and provides:

> A lawyer shall not bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law.

Iowa R. Prof'l Conduct 32:3.1.

We have stated that in order to comply with the rule, the attorney must present an "arguably meritorious claim[] to the court." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Daniels*, 838 N.W.2d 672, 678 (Iowa 2013). The comments to the rule make it clear that an action or filing is not frivolous "merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery." Iowa R. Prof'l Conduct 32:3.1, cmt. [2]. The comment makes clear that what is required of lawyers "is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." *Id.*

2. *Iowa Rule of Professional Conduct 32:3.3(a)(1) (false statements of law or fact before a tribunal).* This rule provides: "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to

correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]" Iowa R. Prof'l Conduct 32:3.3(a)(1).

The comments to the rule make clear that a lawyer is not required to present an impartial exposition of law or to vouch for evidence admitted in a cause, but the lawyer "must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false." *Id.* at cmt. [2].

Under the rule, "knowing" means "actual knowledge of the fact in question" and can "be inferred from circumstances." *Id.* r. 32:1.0(f); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill,* 847 N.W.2d 466, 486 (Iowa 2014). "[T]he omission of information by a lawyer can [also] give rise to a false statement to the court." *Daniels,* 838 N.W.2d at 677.

3. *Iowa Rule of Professional Responsibility 32:8.2(a) (false or reckless statements regarding a tribunal).* This rule provides:

> A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office.

Iowa R. Prof'l Conduct 32:8.2(a).

We established a three-step process for considering violations of this rule in *Iowa Supreme Court Attorney Disciplinary Board v. Attorney Doe No. 792,* 878 N.W.2d 189, 194–95 (Iowa 2016). First, we determine whether the attorney's statements are "capable of being proven true or false." *Id.* at 195. Second, we inquire whether the statements are false. *Id.* Third, we explore whether the attorney "had an objectively reasonable basis for making the statements." *Id.*

We explored the contours of the rule in *Ronwin,* 557 N.W.2d at 520–23. In *Ronwin,* an attorney filed a complaint in federal court alleging that

multiple judges violated his civil rights, that actions taken by the judges amounted to a conspiracy, that the judicial district involved was rife with fraud and corruption, and claimed on appeal that the federal district court "gave comfort and encouragement to the criminal conduct" of Iowa judges. *Id.* at 522. We found a violation of rule 32:8.2(a). In addition, Ronwin engaged in the filing of frivolous legal actions. *Id.* at 520. Based on the egregious nature of Ronwin's conduct, we revoked his license to practice law. *Id.* at 523.

We have found no Iowa case related to the application of the disciplinary rule in connection with an effort to recuse a judge. There is, however, instructive authority from other jurisdictions. In *In re Yelverton*, the District of Columbia Court of Appeals held that a motion to recuse violated a similar local disciplinary rule because the lawyer should have known that there was no basis to disqualify the judge. 105 A.3d 413, 425–26 (D.C. 2014).

And, in *State ex rel. Oklahoma Bar Ass'n v. Bednar*, the Supreme Court of Oklahoma found a violation of a similar rule when an attorney made a motion to recuse the court. 441 P.3d 91, 102 (Okla. 2019) (per curiam). In particular, the court noted that repeated unsubstantiated motions to recuse were used by the offending lawyer as a "procedural weapon designed to run up litigation costs and delay the effect of judgments entered" and therefore the attorney did not have a good-faith reason for bringing the motions. *Id.* at 104.

4. *Iowa Rule of Professional Conduct 32:8.4(c) (dishonesty, fraud, deceit, or misrepresentation).* This rule states: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]" Iowa R. Prof'l Conduct 32:8.4(c).

We have stated that to find a violation, we must find that "the attorney acted knowingly, intentionally, or with the aim to mislead." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noel*, 923 N.W.2d 575, 588 (Iowa 2019) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Guthrie*, 901 N.W.2d 493, 498 (Iowa 2017)). This means that "[t]o find a violation of this rule, '[the court] must find "a level of scienter that is more than negligent behavior or incompetence." ' " *Noel*, 923 N.W.2d at 587 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Suarez-Quilty*, 912 N.W.2d 150, 158 (Iowa 2018)). We have said that "[t]he dispositive question 'is whether the effect of the lawyer's conduct is to mislead rather than to inform.' " *Id.* (quoting *Suarez-Quilty*, 912 N.W.2d at 158).

5. *Iowa Rule of Professional Conduct 32:1.15(a) and (d), and Iowa Court Rule 45.2(2) (trust accounts and client property).* These rules relate to the management of client property by lawyers. Iowa Rule of Professional Conduct 32:1.15(a) and (d) provide:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account.
>
> . . . .
>
> (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. . . . [A] lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

Iowa Court Rule 45.2(2) provides:

> Except as stated in this chapter or otherwise permitted by law or by agreement with the client, a lawyer must promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and must promptly render a full accounting regarding such property.

These rules are meant to "strictly prohibit lawyers from commingling unearned client funds with their own property." *Clarity*, 838 N.W.2d at 655.

**C. Violations of Disciplinary Rules Related to Postdivorce Litigation.**

1. *Frivolous small claims litigation.* The Board charged Widdison with violating Iowa Rule of Professional Conduct 32:3.1 in connection with the filing and prosecution of his claim that Dendy and Northpark owed his law firm attorney fees. The claim was originally filed on December 22, 2014. On January 20, 2015, however, Widdison and his spouse filed a stipulation with the court in the divorce action. The court approved the stipulation and granted the divorce the same day. The stipulation provided that the parties' 50% ownership in Northpark would be awarded to Dendy. Under the stipulation, both parties agreed to a settlement and release of all claims that included any claims: "growing out of the relationship, marriage or business between them, or any corporation, partnership, company or entity owned by them, whether such claims or demands include allegations of tort, negligence, contract claims, or otherwise." Notwithstanding the release, Widdison did not dismiss the claim and it proceeded to trial.

On June 30, Magistrate Jenny Winterfeld dismissed the claim with prejudice. Magistrate Winterfeld found that the plaintiff was fully compensated for his share of attorney fees arising from services to Northpark. Further, Magistrate Winterfeld concluded that any claims Widdison might have against Dendy were "in direct conflict with the parties' Stipulation."

Even if there was a good-faith basis for the claim when originally filed on December 22, 2014, there was no basis for prosecution after the

stipulation was executed by the parties and approved by the court in the divorce action on January 20, 2015. Widdison asserts that he had a good-faith basis for the claim because his professional corporation is a different party than Widdison personally. But the release expressly covers claims by corporations owned by the parties. Like the commission, we find that the Board proved by a convincing preponderance of the evidence that Widdison violated rule 32:3.1 for prosecuting the frivolous small claims action.

2. *Violations related to effort to disqualify the magistrate.* Widdison made a number of attempts to disqualify Magistrate Winterfeld in the small claims action. On this claim, we find the facts as follows.

On May 13, 2015, Widdison made an oral motion to disqualify Magistrate Winterfeld for displaying personal animosity. Magistrate Winterfeld responded by stating that she "had no personal bias or animosity against Attorney Widdison but did not approve of the way Attorney Widdison was conducting himself in the courtroom." After the hearing, Widdison apologized to Magistrate Winterfeld for his behavior.

But, on May 29, Widdison filed a motion for judicial recusal, restating his claim that Magistrate Winterfeld demonstrated animosity toward him, but further asserting that:

> The presiding Magistrate is employed or associated with the Klay Firm. . . . Defendant Northpark Apartments of Sheldon LLC is a client of the Klay Law Firm. . . . [T]here is a direct conflict of interest because the Defendant is a client of Magistrate's law firm.

At the commission hearing, Widdison claimed that his May 29, pleading was supported by a conversation he had with the managing partner of the Klay firm, Brad De Jong. According to Widdison, De Jong confirmed that Northpark was a client of the firm. Although Widdison

claimed at the commission hearing that the Klay firm "did multiple things" for Northpark, he could not provide specifics.

On June 24, Magistrate Winterfeld issued an order on the recusal motion. Magistrate Winterfeld stated that a lawyer with the Klay firm in 2008 had prepared a notice to quit for Northpark in a closed matter. Magistrate Winterfeld noted that she joined the firm in 2012, well after the representation had ceased. Magistrate Winterfeld noted that prior to being appointed in the case, a conflict check was conducted at the Klay firm indicating that neither party was an active or current client of the firm.

The Board charged that Widdison's effort to disqualify Magistrate Winterfeld in the small claims action violated rule 32:3.1 by bringing a frivolous disqualification motion, rule 32:3.3(a) by making a false statement of fact or law to a tribunal, rule 32:8.2(a) by making a false statement regarding the qualifications or integrity of a judge, and rule 32:8.4(c) by engaging in professional misconduct involving dishonesty, fraud, deceit, or misrepresentation. The commission concluded that Widdison violated rules 32:3.1 and 32:3.3(a)(1).

The record before the commission reveals that Widdison filed a bare-bones motion for recusal against Magistrate Winterfeld. He alleged that Northpark "is a client of the Klay Law Firm," that Magistrate Winterfeld "is employed or associated with the Klay Firm," and that she failed to disclose these facts. Her failure to disclose, according to Widdison, would create questions of her impartiality due to conflict of interest. After Magistrate Winterfeld overruled Widdison's motion and explained that her firm was only engaged in unrelated and completed representation in 2008, well before she joined the Klay firm in 2012, Widdison dropped the matter.

Widdison's motion to recuse Magistrate Winterfeld was legally insufficient, but he was not in possession of all the facts. The Klay firm

had represented Northpark in the past on a small matter. Importantly, however, Widdison dropped the issue after Magistrate Winterfeld disclosed the facts. Although Widdison later indicated in his appellate brief that he filed a motion to recuse "because the Magistrate had also performed legal work for Amy and the rental properties in the past," it is not clear that this is a reassertion of Widdison's previous charge or merely a historical description of past events. Therefore, we find that the Board failed to prove by a convincing preponderance of the evidence that Widdison's efforts to recuse Magistrate Winterfeld violated our disciplinary rules.

3. *Violations of disciplinary rules arising from sending a misleading letter to witnesses in the modification proceeding.* As the commission found and we confirm based on our de novo review, Widdison prior to the hearing on the pending modification petition sent what appeared to be a letter addressed to Judge Whittenburg to two potential witnesses, Ploeger and Lammers. The letter stated that negative information would be revealed on cross-examination if the witnesses testified at the hearing. The letter falsely suggested that it was sent to Judge Whittenburg. Its purpose was to intimidate the witnesses. When asked why he sent the letter to Ploeger and Lammers at the hearing, Widdison responded, "I don't know. I don't remember." The commission was not impressed with Widdison's testimony, and neither are we.

Based on these facts, we find that the Board proved by a convincing preponderance of the evidence that Widdison violated rule 32:8.4(c) when he sent the letter to Ploeger and Lammers that misrepresented that it had also been sent to Judge Whittenburg.

4. *Violation of disciplinary rules related to an effort to disqualify the district court judge.* In order to comprehend the course of conduct of Widdison in connection with his effort to disqualify Judge Nancy

Whittenburg, a full understanding of the cascading chronology of postdivorce litigation is necessary. Based on our de novo review, we find the facts as follows.

On April 5, 2016, Widdison's attorney filed a petition for modification of child custody, support, and visitation in the divorce proceeding. District Court Judge Nancy Whittenburg was assigned the matter. Dendy responded with an application for rule to show cause in the divorce.

On February 7, 2017, Judge Whittenburg held a hearing on the petition for modification. Judge Whittenburg at the end of the hearing told the parties that because of her caseload, her ruling would be delayed. Several months later, on May 8, 2017, the court held a hearing on Dendy's application to show cause.

On December 1, Judge Whittenburg entered her order in the modification proceeding. Judge Whittenburg overruled Widdison's petition to modify child custody, granted Dendy's request to modify visitation, and increased the amount of child support to be paid by Widdison to Dendy. In addition, the court ordered Widdison to pay Dendy's attorney fees.

On December 7, regarding the motion to show cause, Judge Whittenburg found Widdison in contempt and sentenced Widdison to serve two days in jail, subject to being purged by compliance with the divorce decree within seven days. Judge Whittenburg again ordered Widdison to pay Dendy's attorney fees.

After receiving an adverse ruling from Judge Whittenburg in the modification proceeding, Widdison made an appearance on his own behalf in the proceeding on December 15.

On March 2, 2018, Widdison sought to recuse Judge Whittenburg from continuing to adjudicate additional matters in the case. Widdison claimed that:

> At the conclusion of the trial on the Petition for Modification, [Judge Whittenburg] disclosed (off the record) to the parties that she was suffering some form of brain cancer and that the Court's decision will take a long time to issue.

The March 2 assertion that Judge Whittenburg had brain cancer that affected her ability to do her work was his first charge against her. Four days later, Judge Whittenburg issued an order recusing herself, but stating that Widdison's assertion that she said brain cancer would delay her ruling "is not a truthful statement."

Widdison was not deterred by Judge Whittenburg's order. On March 7, 2018, he filed a motion to strike and then an amended motion to strike. The motion to strike was his second charge against Judge Whittenburg. Widdison asserted that Judge Whittenburg's statements in her March 6 order were "unnecessary and improper" and "intended to punish [Widdison] for appealing the Court's [December 1, 2017] ruling." According to Widdison, the order was "clearly intended to improperly and unfairly portray [Widdison] in a negative light to the next judge to be assigned in this case." Widdison was now not simply claiming that Judge Whittenburg was recovering from an illness that slowed her work, but that she was on a vendetta to punish Widdison.

On March 9, a hearing on the pending motions was held before Chief Judge Duane Hoffmeyer. At the hearing, Chief Judge Hoffmeyer told Widdison that part of his job was to be aware of how judges are scheduled, that Judge Whittenburg returned from medical leave on November 1, 2013, and that she had been working full time since that date. Further, Dendy's attorney Amanda Van Wyhe filed a resistance to the motion to

strike disputing Widdison's assertions regarding Judge Whittenburg's brain cancer as being a cause for delay in issuing a ruling on the matter.

That same day, Chief Judge Hoffmeyer entered an order that, among other things, directed the motions to strike back to Judge Whittenburg for her to determine whether she wished to change anything in her prior order. Chief Judge Hoffmeyer's order stated, yet again, that "Judge Whittenburg had returned to work on November 1, 2013 and had been working full time since that date."

Notwithstanding Judge Whittenburg's order explaining that the claims were false and Chief Judge Hoffmeyer's oral statement and written order declaring that Judge Whittenburg returned to the bench full time in November 2013, Widdison did not retreat. A half-hour after Chief Judge Hoffmeyer filed his report, Widdison filed what he styled "Report to Court Post March 9th, 2018 hearing." The "report" contained Widdison's third charge against Judge Whittenburg. In the filing, Widdison asserted that during the March 9 hearing, "opposing counsel did not dispute that some post-trial statements were made by Judge Whittenburg to the parties regarding her brain cancer." Widdison emphasized that Chief Judge Hoffmeyer did confirm that Judge Whittenburg had brain cancer in the past. At this point, a judge from a different district, Judge James S. Heckerman, was designated to preside over further proceedings in the case.

Meanwhile, Widdison's appeal proceeded in the appellate courts. In a filing on April 4, 2018, Widdison made his fourth charge against Judge Whittenburg. In the document, Widdison claimed that on May 16, 2015, the date she was appointed to handle the modification matter, that Judge Whittenburg:

[W]as recovering from brain cancer. However, Judge Whittenburg chose not to disclose this health condition to the parties. . . . At the end of the trial and off the record, Judge Whittenburg finally discussed that she was recovering from brain cancer which would effect how long it would take for her to get a Ruling out. On information an belief, . . . [i]t appears that Judge Hoffmeyer misspoke when he said that Judge Whittenburg returned to the bench on November 1 of 2013, because Judge Whittenburg indicated that she returned back to work in November 2015.

(Emphasis omitted.)

On April 5, 2018, Judge Whittenburg entered an order denying Widdison's motion to strike. And, also on April 5, Widdison continued the fight with his fifth charge against Judge Whittenburg, declaring in a motion to strike Whittenburg's most recent order that:

Judge Whittenburg took the liberty of ruling on [Widdison's] Motion to Strike in direct violation of Rule 51:2.7 of the Iowa Code of Judicial Conduct. . . . Judge Whittenburg's April 4th ruling also violated Rule 51:2.3 of the Iowa Code of Judicial Conduct for the second time. . . . In over twenty-two years of practice [Widdison] has never seen such unprofessional conduct by a judge. Judge Whittenburg's April 4th, 2018 Ruling and Order on Amended Motion to Strike contains defamatory statements which constitute libel per se because the statements are false, or were made with reckless disregard for their truth or falsity.

The April 5 motion to strike represented yet another escalation in Widdison's campaign against Judge Whittenburg. He was now declaring that she violated disciplinary rules, was unprofessional, and engaged in defamatory statements.

On April 6, Chief Judge Hoffmeyer issued a calendar entry emphasizing that Judge Whittenburg returned to work in November 2013 and that any statements that she returned to work "in 2016 [sic] are not accurate factually."

On April 10, Widdison filed a response to the calendar entry requesting that Judge Heckerman strike some references in Judge

Whittenburg's March 6 order and to strike Judge Whittenburg's entire April 4 ruling. This amounted to Widdison's sixth charge against Judge Whittenburg. Widdison repeated the claims he made in his April 6 motion to strike, stating:

> Judge Whittenburg took the liberty of ruling on the Respondent's Motion to Strike in direct violation of Rule 51:2.7 of the Iowa Code of Judicial Conduct . . . [and] [r]ecused Judge Whittenburg's April 4th ruling also violated Rule 51:2.3 of the Iowa Code of Judicial Conduct for the second time. . . . Judge Whittenburg's April 4th, 2018 Ruling and Order on Amended Motion to Strike contains defamatory statements which constitute libel per se because the statements are false, or were made with reckless disregard for their truth or falsity.

Finally, in his amended reply brief in the appellate case, Widdison made additional assertions regarding Judge Whittenburg. In the context of disagreeing with her calculation of child support, Widdison asked, "Was this a symptom of brain cancer?" Widdison claimed in his brief that Judge Whittenburg's recusal order made reference to "false statements" but did not actually identify any "false statements." Widdison then asked, "Symptom of brain cancer?" And, finally, Widdison declared:

> Because the trial Court failed to inform the parties of her brain cancer as required by the Iowa Code of Judicial Conduct, the trial Court's Ruling is questionable because there is a significant probability the brain cancer impacted the trial Court Judge's memory and intellectual capacity and function.

The amended reply brief was Widdison's seventh charge against Judge Whittenburg and now specifically suggested that illness impacted her ability to do the job.

Lawyers are all human, of course, and mistakes, including unjustified attacks or potshots at a judge, occasionally occur by a lawyer who knows better. But Widdison's conduct was not a simple uncharacteristic error of judgment that could be largely salved by an expression of remorse. Widdison launched a deliberate campaign,

stretched over a several-month period, where he repeatedly attacked Judge Whittenburg. It commenced when she ruled adversely to Widdison in the modification action and it extended into the appellate courts with increasingly shrill language.

And so it is not just a matter of piling on. Over time, the assertions became qualitatively more troubling. Widdison's statements first suggested that illness delayed a ruling in his case. Not very attractive, but not severe either. But it escalated from there. Widdison had dug the proverbial hole, and instead of stopping when the jig was up, he kept digging. In the end, he was questioning Judge Whittenburg's integrity, accusing her of violating ethical rules, claiming she committed libel per se, and implied that her brain cancer affected the quality of her work. Even if Widdison could have made his initial statement without "knowing" its falsity, he certainly violated the rule by not abandoning the argument after Judge Whittenburg and Chief Judge Hoffmeyer set the record straight. The facts regarding Judge Whittenburg's health were false and after statements by Judge Whittenburg and Chief Judge Hoffmeyer, Widdison had no objectively reasonable basis for continuing to make the statements about Judge Whittenburg.

We come to the conclusion that Widdison's conduct is simply unacceptable for an Iowa lawyer. Obviously, his conduct drained judicial resources. Although all of us in the judicial branch must be prepared for criticism, fair and unfair, the unsubstantiated attacks on a judicial officer from an Iowa lawyer in this case are beyond the pale.

We find that the Board proved by a convincing preponderance of the evidence that Widdison violated rules 32:3.3(a)(1) and 32:8.2(a) by making a false statement and then failing to correct the statement attacking the qualifications and integrity of a judge.

**D. Violations Related to the Client Trust Accounts.** The Board's complaint against Widdison included several violations of client safekeeping of property under Iowa Rule of Professional Conduct 32:1.15(a) and (d), and Iowa Court Rule 45.2(2). Although the commission dismissed the charges related to trust accounts and the Board has not appealed, the entire matter is still before us. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 364–65 (Iowa 2005). On the trust account issues, we find the facts as follows.

In December 2018, Tony A. Bennett, an auditor for the Client Security Commission commenced an audit of Widdison's client trust account. As a result of the audit, Bennett identified a difference between the client account balances and the check register balance of $2899.01. Bennett concluded that the difference resulted from manual records that were not current.

Bennett also identified six negative client balances. He determined that the negative balances resulted from Widdison inputting in his records funds received in one month but not depositing the funds until the following month.

Bennett also identified seven stale client account balances without activity for a year. Once the balances were identified, Widdison either withdrew and applied the balances to outstanding fees or refunded them to the clients.

In his response to the Board's complaint regarding alleged disciplinary violations, Widdison asserted about the 2018 audit that, among other things, there were no "stale client balances" and that there were no negative client balances.

The Board asserts that Widdison made false statements when he told the commission that there were no stale client balances, no negative

client balances, and no lost accountability of client funds. Widdison testified that he meant the statements to apply at the conclusion of the 2018 audit after he had an opportunity to engage in the repairs necessary to bring his accounts into compliance. While Widdison's choice of words in his response to the Board was questionable, we do not find that the Board proved by a convincing preponderance of the evidence a knowing misrepresentation in violation of rule 32:8.1(a).

We find that the Board proved by a convincing preponderance of the evidence that Widdison violated rules 32:1.15(d) and 45.2(2) when he failed to promptly return unused retainer fees to clients. Once a client matter is closed, an attorney must promptly return the funds. Here, the balances were relatively small (ranging from $24.51 up to $1210.70) and were fully refunded to the clients. Because Widdison failed to return unused client funds for over one year after the matters were closed, he violated the rules. We do not believe Widdison's actions demonstrated an intent to enrich himself or to harm his clients nor do we find that he engaged in intentional misconduct related to the stale client accounts.

We do not, however, find that Widdison violated rule 32:1.15 in the management of his client trust accounts as far as the negative account balances or the small discrepancies between manual and electronic records. The Client Security Commission's auditor agreed that Widdison's errors were minor mathematical errors and were common to sole practitioners around the state. After Widdison was made aware of the irregularities, he took corrective action. We do not quibble with the commission's characterization of Widdison's trust accounting as "sloppy," but there was no evidence that Widdison engaged in intentional misconduct related to trust account matters and no client harm occurred from the accounting irregularities. We wish, of course, that client trust

accounts never contain any errors, but such a goal is not realistic and is not demanded by our ethical rules.

### E. Sanctions.

1. *Overview.* When determining the severity of sanctions to be imposed for violation of disciplinary rules, we review the "totality of facts and circumstances" in each case. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Deremiah*, 875 N.W.2d 728, 737 (Iowa 2016). We will consider "the nature of the violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the attorney's fitness to continue practicing law, as well as any aggravating or mitigating circumstances." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 337 (Iowa 2015).

The Board endorses the commission's sanction of a one hundred twenty-day suspension. The Board emphasizes that although there was no client harm, there was harm to Dendy in the small claims matter and that scarce judicial resources were used because of Widdison's misconduct. The Board emphasizes the persistence of Widdison's behavior as an aggravating factor.

Widdison argues for a private reprimand as the appropriate sanction. He notes that he has been active in various bar association activities, has participated in pro bono representation, and has been active in community affairs. He cites the trauma of his divorce and the loss of his father as mitigating factors that clouded his judgment. He notes that he "should have dropped the cancer issue" and "hope[s] that Judge Whittenburg can forgive [his] misunderstanding and accept [his] sincere apology." He states that even a short suspension would have a devastating impact on his practice and would prejudice his clients, some of whom are indigent Iowans.

2. *Aggravating factors.* The Board asserts several aggravating factors. Multiple rule violations may give "rise to more serious sanctions." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Parrish*, 925 N.W.2d 163, 181 (Iowa 2019). "[S]ubstantial experience in the practice of law is another aggravating factor." *Id.* Here, we have found violations of rules 32:3.1, 32:3.3(a), and 32:8.4(c). We have stated that noncompliance with the technicalities of the client trust account rules carry a lesser sanction than conversion of client funds. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Cepican*, 861 N.W.2d 841, 844 (Iowa 2015). Considering Widdison's violations of the client trust account rules were minor, unintentional, and did not create client harm, we do not find that his violation of rules 32:1.15 or 45.2(2) provide a significant basis for enhanced sanctions.

Another aggravating factor is Widdison's persistence in his prosecution of the small claims action and in his efforts to attack Judge Whittenburg. We have previously stated that an attorney's persistence "in perpetuating his falsehood is a remarkable aggravating factor" when an attorney had multiple opportunities to correct the misconduct "but instead simply dug himself into a progressively deeper ethical pit." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 466 (Iowa 2014) (suspending attorney's license for six months for repeatedly lying to opposing counsel and to the district court about a falsified certificate of service). Widdison similarly had opportunities to recant allegations but continued his course.

Finally, we agree with the commission's determination that Widdison's testimony during the disciplinary hearing was either evasive or untruthful and constitutes an aggravating factor. *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Tofflemire*, 689 N.W.2d 83, 92 (Iowa 2004). The commission found Widdison's performance as a witness the most

egregious aggravating factor. We also find Widdison calling his wife as a witness to restate his false position was a troublesome tactic that aggravates Widdison's misconduct.

3. *Mitigating factors.* We have held that a clean disciplinary record is a mitigating factor. *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Williams*, 675 N.W.2d 530, 533 (Iowa 2004). Widdison has not been previously disciplined over more than two decades of practice.

An attorney's acceptance of responsibility is also a mitigating factor. *Tofflemire*, 689 N.W.2d at 93. Widdison gets marginal consideration here. Widdison admitted at the disciplinary hearing that if he "had to do it all over again [he] would not have sent the letter out" to Ploeger and Lammers. In his statement regarding appropriate sanctions, Widdison said that he "should have dropped the cancer issue and not pursued it" and hopes that Judge Whittenburg can forgive him for his misconduct. He continues to believe, however, that his small claims action was made in good faith. And, he asserts that Magistrate Winterfeld was "legally incorrect on the conflict of interest issue."

Finally, in his statement regarding sanctions, Widdison said that since the events of this matter he has received counseling. We have found seeking counseling a mitigating factor in disciplinary proceedings. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 156 (Iowa 2018).

4. *Appropriate sanction.* For attorney misrepresentations, depending on the severity, we have previously sanctioned anywhere from a reprimand to license revocation. *Bartley*, 860 N.W.2d at 338. In *Sporer*, an attorney violated rules 32:3.1, 32:3.3(a)(1), and 32:8.4(c) for asserting a frivolous claim, testifying that he believed the claim, and falsely claiming that he sent a letter to an opposing counsel that he did not, and we suspended the attorney's license for six months. 897 N.W.2d at 85–91.

The sanction was mitigated by the attorney's cooperation but aggravated by his experience, multiple rule violations, and prior disciplinary history. *Id.* at 90.

In *Rhinehart*, we found that an attorney violated rule 32:8.4(c) and (d), in addition to rules related to client property, during his dissolution of marriage proceeding when he committed extrinsic fraud after failing to deposit disputed funds into a trust account. 827 N.W.2d at 180–82. The nature of the violations were aggravating factors, primarily an inexcusable delay in returning client funds, and the attorney's lack of prior disciplinary history as well as a "general reputation for being a hardworking, highly competent, zealous advocate" were both mitigating factors. *Id.* at 183. We suspended the attorney's license for sixty days. *Id.*

For violations of rule 32:8.2(a), we have given sanctions ranging from admonishment to revocation. In *Weaver*, we suspended an attorney's license for three months because he made a false statement to a newspaper that a judge who presided over the attorney's OWI offense was personally biased against the attorney and was dishonest about the reason for imposing the particular sentence on the attorney. 750 N.W.2d at 77–78, 92. In *Ronwin*, we revoked an attorney's license after he falsely accused judges of "deliberately lying" and that one of the judge's actions amounted to obstruction of justice. 557 N.W.2d at 521, 523. In *Committee on Professional Ethics & Conduct v. Horak*, we reprimanded an attorney for falsely stating in a court document that the judge was participating in a conspiracy with the opposing counsel against the attorney because the judge allowed an ex parte order authorizing an amended pleading. 292 N.W.2d 129, 130 (Iowa 1980) (en banc).

> Attorney disciplinary proceedings are not designed to punish, but rather to determine the fitness of an officer of court to continue in that capacity, to insulate the courts and

the public from those persons unfit to practice law, to protect the integrity of and the public confidence in our system of justice, and to deter other lawyers from engaging in similar acts or practices.

*Comm. on Pro. Ethics & Conduct v. Vesole*, 400 N.W.2d 591, 593 (Iowa 1987) (quoting *Comm. on Pro. Ethics & Conduct v. Borchart*, 392 N.W.2d 491, 492 (Iowa 1986) (en banc)). It is not the case that an attorney gets one free pass because they have not been previously disciplined nor should the attorney get a free pass because of a difficult situation in their personal life.

Finally, we observe that the problems in this case would likely have been avoided if Widdison had not decided to represent himself in matters related to a stressful divorce. This case is a textbook example of why in difficult emotionally challenging circumstances the assistance of a qualified and objective lawyer is desirable in light of the risk that a pro se lawyer with clouded judgment will cross the Rubicon of our ethical rules and then double down on resulting misconduct.

After considering the entire record, the mitigating and aggravating factors, and our relevant precedent, we conclude that Widdison's license to practice law should be suspended for ninety days.

## IV. Conclusion.

For the foregoing reasons, we find that Widdison violated Iowa Rules of Professional Conduct 32:3.1, 32:3.3(a)(1), 32:8.2(a), 32:8.4(c), and 32:1.15(d), and Iowa Court Rule 45.2(2). We suspend his license to practice law for ninety days. The suspension will continue indefinitely for the minimum of ninety days and until we approve Widdison's written application for reinstatement. Iowa Ct. R. 34.23(1). This suspension applies to all facets of the practice of law. *Id.* r. 34.23(3). Widdison must comply with the client and counsel notification requirements of Iowa Court

Rule 34.24. Costs are taxed against Widdison pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**